IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BETTY JEAN COLE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Case No.03-CV-327-GKF-PJC |
| ASARCO INCORPORATED, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| THE DOE RUN RESOURCES | ) |
| CORPORATION, | ) |
| | ) |
| Third Party Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Third Party Defendant. | ) |

**OPINION AND ORDER**

This matter comes before the Court on plaintiffs' Motion for Class Certification (Doc. No. 177) and defendants' Motion to Strike Newly Asserted Bases for Class Certification (Doc. No. 286). For the reasons set forth below, plaintiffs' Motion for Class Certification is denied and defendants' Motion to Strike is denied as moot.

**I. Background and Procedural History**

This action arises from pollution caused by mining in the 40-square mile Tar Creek area, located in Ottawa County in Northeast Oklahoma. In the period from 1891 until about 1970, hundreds of companies mined lead and zinc, along with other minerals, at Tar Creek.

"Chat" and "tailings" are two byproducts of lead mining and milling. "Chat" refers to the

gravel-like by-product of a gravity based jigging process used to separate minerals from ore during the early days of mining and milling in the district. "Tailings" are the finer materials that resulted from an additional separating process added to the mills in the mid-1920s. Each mined property had a chat pile. Some of the chat and tailings have been sold and used for, among other things, road base, road surface material, concrete building foundations and railroad ballast.

The chat and tailings contain lead and other toxins. Exposure to high levels of lead poses a risk of neurological damage, including cognitive and verbal function deficits, decreased educational performance, learning difficulties, aggression, anti-social behavior and attention deficits. Children under the age of six are particularly vulnerable to injury from prolonged lead exposure.

Plaintiffs in this action are residents and property owners in and around the towns of Picher and Cardin ("Picher-Cardin") in Ottawa County, Oklahoma.[1] The original defendants in the case, ASARCO Incorporated, Blue Tee Corporation, Goldfields Mining Corporation, NL Industries Incorporated, Childress Royalty Company and The Doe Run Corporation, all owned and/or operated zinc and lead mines in the Tar Creek area.

In their First Amended Complaint filed November 23, 2003, plaintiffs allege mining activities of the defendants have caused air, surface and ground water and soil contamination of their property, exposing residents to unsafe levels of lead, heavy metals and other toxins. [Doc. No. 76]. They assert causes of action for common law nuisance and statutory nuisance, and seek

---

[1] Named plaintiffs are: Betty Jean Cole; John Frazier; Patsy Huffman; Edwin Kerley; Patricia Kerley; Larry Olds; H.C. Bauman; Rayma Grimes; Lloyd Stone; Ernest Freeman, as Mayor of Picher, Oklahoma; and Robert Walker, as Chairman of the School Board of Picher-Cardin.

certification of a medical monitoring class and a property owner class.

On behalf of the medical monitoring class, plaintiffs seek various medical screening programs, a medical registry, collection and distribution of medical information, additional research on lead-induced disease, a long term epidemiological study, a health risk assessment and early marker studies and creation of a panel allowing citizen participation in all decision making as pertains to the medical monitoring program. With respect to the property owner class, plaintiffs seek creation of an independent relocation program, as well as actual and punitive damages for diminution in property value.

Defendants Gold Fields Mining Corporation ("Gold Fields") and The Doe Run Resources Corporation ("Doe Run"), filed counterclaims against the City of Picher and the School Board of Picher-Cardin, and Doe Run filed a Third Party Complaint for contribution against the United States of America. [Doc. No. 34]. Doe Run alleged the government, as trustee for the Quapaw Indian Tribe, acted as lessor of zinc and lead mines located on the Quapaw Indian Reservation in Northeast Oklahoma. The third party proceedings were stayed by agreement of the parties. [Doc. No. 77]. After plaintiffs' Motion for Class Certification was filed, The Quapaw Tribe of Oklahoma filed a Motion for Leave to Intervene. [Doc. No. 212]. Magistrate Judge Paul J. Cleary granted the motion, giving the Quapaw Tribe leave to intervene for the limited purpose of objecting to plaintiffs' class certification motion. [Doc. No. 248].

Meanwhile, on September 16, 2005, ASARCO filed its Suggestion of Bankruptcy, [Doc. No. 231], prompting issuance of an Administrative Order staying the case. [Doc. No. 244]. Plaintiffs reached a settlement of their property value claims with ASARCO in bankruptcy court (*In re ASARCO, LLC,* Case No. 05-21207, U.S. Bkrptcy. Cot., S.D., TX, Corpus Christi

Division), and on August 1, 2008, the court entered an order granting plaintiffs' Unopposed Motion to Dismiss Defendant ASARCO With Prejudice as Per the Direction of the U.S. District Court Overseeing the ASARCO, LLC Bankruptcy Proceedings. [Doc. Nos. 260, 261].

The parties filed supplemental briefs on plaintiffs' class certification motion on January 16, 2009. The supplemental briefs reveal the following developments relevant to consideration of plaintiffs' motion:

- In the ASARCO bankruptcy proceedings, plaintiffs' counsel asserted, mediated and settled individual claims on behalf of 523 individual property owners, including most if not all of the *Cole* putative property damage class.

- In 2004, the state created a statutory buyout program to relocate families with children aged six and younger living in the Tar Creek area. *See* 10 Okla.Stat.Ann. §7601-7608. The program was state-funded.

- A broader statutory buyout program was established in 2006 by Okla. Senate Bill 1463 (27A Okla.Stat.Ann. §2201-2206). The federally-funded program provides for relocation of persons living in an area deemed to be "at greatest subsidence risk" caused by the historic mining operations in Ottawa County. The program is administered by the "Lead-Impacted Communities Relocation Assistance Trust" ("LICRAT"). The "Relocation Assistance Zone" designated by LICRAT includes the proposed Class Area. As of the October 14, 2006 deadline, LICRAT had received 879 applications for assistance, including many of the named plaintiffs in this lawsuit. Buyouts under the program are not based on current market value, but rather on the average cost of comparable property elsewhere in Ottawa County. 27A Okla.Stat.Ann. §2203(B)(3, 5 and 6).

- On May 10, 2008, an EF-4 tornado struck the town of Picher, killing six people, injuring more than 100, and causing heavy destruction through the south side of the town. In the days following the tornado, LICRAT opted to allow owners of damaged property who had previously declined buyout offers to reconsider their decisions.

## II. Description of Classes to be Certified

Plaintiffs seek certification of two classes: a Medical Monitoring Class pursuant to Fed.R.Civ.P. 23(b)(2) for statutory private nuisance under 50 O.S. §1, and a Property Owner

4

Class pursuant to Fed.R.Civ.P. 23(b)(3) for private nuisance under Oklahoma common law. The Medical Monitoring Class is described as:

> All individuals who, since at least May 14, 2001, continuously resided within the Class Area for more than one year.

[Doc. No. 177, p. 4]. The Property Owner Class is described as:

> All individuals and entities who owned or had an interest in real property in the Class Area as of May 14, 2001.[2]

The Class Area is defined as "Picher-Cardin and consists of the entire geographic area comprising the towns of Picher and Cardin" and "the Picher-Cardin School District." [Doc. No. 76, ¶52].

### III.  Standards for Class Certification

Rule 23(a) provides:

> **Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to meeting the prerequisites of Rule 23(a), plaintiffs must also demonstrate the class sought to be certified meets one of the following criteria:

> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

---

[2] Although plaintiffs sought an independent relocation program in the First Amended Complaint, they do not seek certification of that claim or any class pursuing the claim. [Doc. No. 177, p. 5, n. 2].

5

>    (1) prosecuting separate actions by or against individual class members
>       would create a risk of:
>
>       (A) inconsistent or varying adjudications with respect to individual
>          class members that would establish incompatible standards of
>          conduct for the party opposing the class; or
>
>       (B) adjudications with respect to individual class members that, as
>          a practical matter would be dispositive of the interests of the
>          other members not parties to the individual adjudications or
>          would substantially impair or impede their ability to protect
>          their interests;
>
>    (2) the party opposing the class has acted or refused to act on grounds that
>       apply generally to the class, so that final injunctive relief or corresponding
>       declaratory relief is appropriate respecting the class as a whole; or
>
>    (3) the court finds that the questions of law or fact common to class members
>       predominate over any questions affecting only individual members, and
>       and that a class action is superior to other available methods for fairly and
>       efficiently adjudicating the controversy.  The matters pertinent to these
>       findings include:
>
>       (A) the class members' interests in individually controlling the
>          the prosecution or defense of separate actions;
>
>       (B) the extent and nature of any litigation concerning the controversy
>          already begun by or against class members;
>
>       (C) the desirability or undesirability of concentrating the litigation
>          of the claims in a particular forum; and
>
>       (D) the likely difficulties in managing a class action.

"The class action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 155 (1982) (citations omitted).  As the parties seeking certification, plaintiffs bear a strict burden of proving that all the requirements of Rule 23(a) are met. *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 435 (10th Cir. 1978).  The district court

must engage in its own "rigorous analysis" of whether the prerequisites of Rule 23(a) have been satisfied. *Shook v. El Paso County,* 386 F.3d 963, 968 (10th Cir. 2004), citing *Falcon,* 457 U.S. at 161. The court, in its analysis, must accept the substantive allegations of the complaint as true. *Shook,* 386 F.3d at 968, citing *J.B. v. Valdez,* 186 F.3d 1280, 1290 n.7 (10th Cir. 1999). However, it "need not blindly rely on conclusory allegations which parrot Rule 23" and "may consider the legal and factual issues presented by plaintiff's complaints." *Shook,* 386 F.3d at 968; *J.B. v. Valdez,* 186 F.3d at 1290 n.7.

Whether a case should be allowed to proceed as a class action involves intensely practical considerations, most of which are purely factual or fact-intensive. *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir. 1988), citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 402-03 (1980). "Each case must be decided on its own facts, on the basis of practicalities and prudential considerations." *Reed* at 1309. "[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Falcon,* 457 U.S. at 160 (citations omitted). Therefore, while the court is not to *decide* the case on its merits, it should make whatever factual and legal inquiries are necessary under Rule 23. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996); *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001). Actual rather than presumed conformance with Rule 23(a) remains indispensable. *Falcon,* 457 U.S. at 160. The same requirement applies to Rule 23(b). *Szabo,* 249 F.3d at 677.

### IV.  Analysis

#### A. Medical Monitoring Class

Plaintiffs' medical monitoring claim is based on Oklahoma's common law of nuisance.

7

The parties cite, and the court finds, no state law addressing the propriety of a medical monitoring remedy. However, Oklahoma law requires plaintiffs to demonstrate an existing disease or physical injury before they can recover the costs of future medical treatment that is deemed medically necessary. *See Vaught v. Holland,* 554 P.2d 1174, 1178 (Okla. 1976). Here, the plaintiffs who seek to represent the medical Monitoring Class have disavowed any injury. Thus, Oklahoma law does not support creation of a medical monitoring class.

Tenth Circuit law also casts doubt on the permissibility the medical monitoring remedy sought in this case. In *Building & Constr. Dept. v. Rockwell Int'l. Corp.,* 7 F.3d 1487, 1492 (10th Cir. 1993), the Tenth Circuit affirmed the district court's grant of summary judgment in favor of defendant employer on the grounds plaintiffs' claims for medical monitoring were barred by the exclusivity provisions of the Colorado Workmen's Compensation Act. In so ruling, the court characterized the medical monitoring claim brought by current and former employees of defendant as one for "personal injury" and "essentially a suit for damages as a remedy for past misconduct." *Id.* 1492-94. In *Boughton v. Cotter Corp.,* 65 F.3d 823, 827 (10th Cir. 1995), the court affirmed a district court decision denying certification of a medical monitoring class on the basis that "the relief sought was primarily money damages." In that case, plaintiffs alleged exposure to hazardous emissions of defendant's uranium mill. Generally, plaintiffs did not allege physical illnesses, but sought medical monitoring. Finally, in *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 480 (D. Colo. 1998), the district court, which had earlier certified medical monitoring and property damage classes in a suit arising out of alleged releases of radioactive and non-radioactive substances by defendant, reversed its decision on the medical monitoring class. The court, relying on *Building & Constr.* and *Boughton,* stated, "Since the

initial certification opinion, the Tenth Circuit has stated unequivocally that the identical type of medical monitoring relief to that sought here is essentially for damages." *Id.* at 480 (citations omitted).

In light of Oklahoma and Tenth Circuit law, the court finds certification of a medical monitoring class is inappropriate.

### B.  Property Owner Class

#### 1.  Rule 23(a) Prerequisites

##### a.  Numerosity

In determining whether the proposed class meets Rule 23(a)'s numerosity requirement, the court must first determine whether the class is sufficiently defined so that potential class members can be identified. *Davoll v. Webb,* 160 F.R.D. 142, 144 (D. Colo. 1995). While the class need not be so ascertainable that every potential member can be specifically identified at the commencement of the action, the description must be sufficiently definite so that it is administratively feasible for the court to ascertain whether a particular individual is a member. *Joseph v. General Motors Corporation,* 109 F.R.D. 635, 639 (D. Colo. 1986); *Cherokee Nation of Oklahoma v. United States,* 199 F.R.D. 357, 360 (E.D. Okla. 2001).

Applying plaintiffs' definition of the proposed class ("All individuals and entities who owned or had an interest in real property in the Class Area as of May 14, 2001"), the court concludes identification of members would *not* be administratively feasible. Plaintiffs contend "the identities of the members of the Property Owners Class can be easily ascertained objectively (such as thorough examination of deeds.)" [Doc. No. 177, p. 10]. This conclusory statement, however, does not withstand scrutiny. An examination of evidence concerning the named

plaintiffs themselves illustrates this problem of identifying potential class members. For example, H.G. Bauman, who seeks to represent commercial property owners in the proposed class, does not live in the proposed Class Area, nor does he own residential or commercial property in the Class Area. He is president of First State Bank of Picher, but does not own the bank or the land upon which it sits. The bank itself owns the property but is not a named plaintiff. Bauman is one of 12 owners of a holding company that owns the bank. Another named plaintiff, Patsy Huffman, owns no land in Picher. She and her husband live in a house they bought for one dollar ($1.00) in 1959. The house is built on restricted Indian land. A revocable permit assigned exclusively to her husband, who is not a party to the lawsuit, allows the couple to occupy the land for an annual payment of $259. Under the terms of the revocable permit, the Huffmans could be required to move or abandon their home upon 30 days' notice. The Huffmans sold their home in the LICRAT federally-funded buyout for $126,000 in 2007.

A "thorough examination of deeds," as suggested by plaintiffs, does not reveal these individuals' interest in property. If examination of deeds does not pick up the interests claimed by even *named* plaintiffs, it could not be expected to suffice to identify the interests of other putative class members who "owned or had an interest in real property" in the Class Area. It would therefore be extremely difficult, applying plaintiffs' suggested approach, to identify the potential class members having any interest, recorded or unrecorded, in real property. Thus, identification of members of the proposed class would be administratively unfeasible.

Plaintiffs' definition of the proposed class is untenable with respect to its description of

persons who "owned or had an interest in real property."[3]  "Absent a cognizable class, determining whether plaintiffs or the putative class satisfy the other Rule 23(a) and (b) requirements is unnecessary." *Davoll v. Webb,* 160 F.R.D. at 146.

While further analysis of the remaining requirements of Rule 23(a) and (b) is unnecessary, the court alternatively concludes that, in light of the LICRAT buyout program, plaintiffs have not met their burden as to numerosity. The LICRAT buyout program has unquestionably diminished substantially the number of property owners.  The parties have not provided statistics concerning the actual number of buyouts in the Picher-Cardin area.  However, as of October 14, 2006, LICRAT had received 879 applications for assistance.  The program was reopened in 2008 for area residents whose houses were damaged by the May 10, 2008, tornado.  Further, the fact that plaintiffs' counsel succeeded in locating and establishing an attorney-client relationship with 523 plaintiffs and were able to pursue, successfully, plaintiffs' individual claims for property damage in the ASARCO bankruptcy proceedings, undermines any

---

[3]Plaintiffs' description of the Class Area is also troubling.  Plaintiffs define the Class Area as "the entire geographic area comprising the towns of Picher and Cardin" and "the Picher-Cardin School District."  To support the geographic designation, plaintiffs present the testimony of their expert, Kirk Brown, that lead from all chat piles could have "at least" some effect on every property in the proposed Class Area. Dr. Brown opined that if a circle of arbitrary radius were drawn around every historical mine shaft and every existing chat pile in Picher and Cardin, those circles would encompass much of both towns. [Doc. No. 194, Ex. 24, Expert Report of Kirk. W. Brown at Fig. 4.1].  However, Dr. Brown offered no scientific basis for the size or uniform shape of his circles, did not conduct sampling to verify his theory concerning the extent of contamination within the circles, and did not link the sites replied upon to the actual activities of defendants or the prevailing winds.  While a *Daubert* analysis of expert opinion is not required at the class certification stage, the court should not certify a class on the basis of an expert opinion so flawed that it is inadmissible as a matter of law.  *In re Visa Check/MasterMoney Antitrust Litig.,* 192 F.R.D. 68,76-77 (E.D.N.Y. 2000), *Vickers v. General Motors Corp.,* 204 F.R.D. 476, 479 (D. Kans. 2001).  The court questions whether Dr. Brown's report is based on a reliable foundation.

argument under Rule 23(a)(1) that "the class is so numerous than joinder of all members is impracticable," or under Rule 23(b)(2) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### b. Typicality

The court also concludes, alternatively, that plaintiffs have not met their burden of establishing the typicality prerequisite of Rule 23(a)(3). The typicality analysis requires "a comparison of claims or defenses of a representative party with claims or defenses of the class." *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 270 (10th Cir. 1975). The typicality requirement limits the class claims to those "fairly encompassed" by the claims of the named plaintiffs. *General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 330 (1980).

With respect to typicality, at least three named plaintiffs–H. G. Bauman, Sam Freeman and Robert Walker–assert claims that are clearly *atypical*. Although Bauman owns neither residential nor commercial real estate in the Class Area, he asserts a property diminution claim based on his partial ownership of a holding company that owns a bank that owns the commercial property on which the bank is located in Picher. Freeman brought suit in his official capacity as mayor of the City of Picher. The City owns numerous unique properties, including a water tower, pumping stations, sewage lagoons, city hall, a street barn and a sports complex. Plaintiffs' expert concedes these properties cannot be valued using the same statistical valuation techniques as residential property. Freeman also purports to represent other entities including the Picher Firefighters' Association and various trusts, some of which have deliberately sought to acquire known lead-contaminated properties. Walker brought suit in his official capacity as Superintendent of the Picher-Cardin School District, which allegedly controls more than $10

million worth of public property and operates under the authority of the State of Oklahoma. The property on which the Picher-Cardin school complex sits was deeded to the district by Eagle Picher Company, a mining company not named as a defendant in this lawsuit, and is the site of several chat piles. Analysis of the diminution in value of the school district's property would be nothing like valuation of residential property.

### c. Adequacy of Representation

In addition, the court finds plaintiffs have not established they will adequately protect the interests of the class, as required by Rule 23(a)(4). In order to establish adequacy, plaintiffs must show both that proposed class counsel is qualified and that the individual plaintiffs' claims are "sufficiently interrelated to and not antagonistic with the class's claims so as to ensure fair and adequate representation." *Zapata v. IBP, Inc.,* 167 F.R.D. 147, 160-62 (D. Kans. 1996). In their First Amended Complaint [Doc. No. 76], plaintiffs sought certification of a medical monitoring class that excluded "any individual who has already manifested any illness, disease, or ailment attributable to lead exposure." [Doc. No. 76, ¶53]. However, in their class certification motion, plaintiffs do *not* exclude symptomatic individuals. The four named plaintiffs who seek to represent the class all purport to be asymptomatic. [Doc. No. 76, ¶54]. The interests of asymptomatic plaintiffs are not necessarily aligned with those who assert personal injuries. *See Georgine v. Amchem Prods. Inc.,* 83 F.3d 610, 626 (3d Cir. 1996), *aff'd.* 521 U.S. 591 (1997); *Rink v. Cheminova, Inc.,* 203 F.R.D. 648, 664 (M.D. Fla. 2001); *Wall v. Sunoco, Inc.,* 211 F.R.D. 272, 279 (M.D. Pa. 2002). Indeed, plaintiffs in this action assert no personal injury claims on behalf of the class, despite alleging in both the First Amended Complaint and the class certification brief that many residents of Picher-Cardin suffer from

13

serious ailments as a result of lead exposure.

Additionally, some of the named plaintiffs appear to have conflicts of interest with the putative class. In fact, two defendants have filed counterclaims against the City of Picher and the school district based on those parties' alleged ownership, sale and/or use of chat. Freeman and Walker serve as trustees on the Oklahoma Lead-Impacted Communities Relocation Assistance Trust. In that capacity, both are involved in administering a process that plaintiffs' own property valuation expert has warned will have a devastating impact on the property market in that area.

Many of the named plaintiffs appear to lack standing to sue. Although the holding company in which Bauman owns a partial interest would have standing to assert a claim for diminution in the value of the bank property, Bauman does not, himself, possess that right. *See Jones v. Ford Motor Co.,* 599 F.2d 394, 397 (10th Cir. 1979). Edwin Kerley, Larry Olds and John Frazier, all claim diminution in value of property they own with their spouses, who are not parties to the suit. Under Oklahoma law, all parties having an interest in real property must join in an action for damage to the property. *Haught v. Continental Oil Co.,* 136 P.2d 691,693 (Okla. 1943). Freeman and Walker, too, have standing issues. Under Oklahoma law, municipalities and school districts have power to sue and be sued. *See* 11 Okla.Stat.Ann. §22-101; 70 Okla.Stat.Ann. §5-105. The city and the school district themselves, rather than individual members of their governing bodies, must assert their property claims. *See Randolph v. Cantrell,* 707 P.2d 48, 51 (Okla. Ct. App. 1985).

Plaintiffs have failed to meet their burden of establishing merosity and typicality of

claims and their adequacy as class representatives.[4]

## V. Conclusion

Plaintiffs' Motion for Class Certification [Doc. No. 177] is denied. Having reached the conclusion that plaintiffs failed to identify a cognizable class under Rule 23(a), the court finds defendants' Motion to Strike [Doc. No. 286], which attacked plaintiffs' efforts to satisfy Rule 23(b), to be moot, and therefore denies the motion.

ENTERED this 2nd day of April, 2009.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

[4]Because the court found plaintiffs have not satisfied the requirements of Rule 23(a), it does not address the issues posed by Rule 23(b)(3) concerning predominance of common issues over individual issues and whether a class action is the superior method for fairly and efficiently adjudicating the controversy. However, the circumstances of this case make the court believe certification under Rule 23(b)(3) would be inappropriate. First, hundreds of companies mined lead and zinc in the Tar Creek area for nearly a century, yet only a handful have been sued. Additionally, the offending chat was traded commercially and used for roads, surfaces and building foundations. In fact, defendants have asserted counterclaims against two of the plaintiffs based on plaintiffs' acquisition and use of chat, which defendants claim has contributed to contamination. In this respect, this case is distinguishable from *Ponca Tribe of Indians of Oklahoma v. Continental Carbon Company,* 2007 WL 28243 (W.D.Okla.), a recent decision relied upon heavily by plaintiffs. In the *Ponca* case, the defendant and third party defendant were undisputedly the only two sources of the carbon black pollution complained of by plaintiffs. This case is further complicated by events occurring after its filing. In many respects, the class action claims have been overtaken by these subsequent developments. The implementation of a state buy-out program and a federally-funded buy-out program, the effect of property valuations undertaken in connection with the programs, and the May 2008 tornado, are factors that complicate the case and make it even less amenable to class adjudication.